## NUCLEUS OF CHICAGO HOMEOWNERS ASSOCIATION et al., Plaintiffs-Appellants,

v.

## James T. LYNN et al., Defendants-Appellees.

### No. 74–1206.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 21, 1974.

Decided Oct. 6, 1975.

---

Joseph V. Karaganis, Chicago, Ill., for plaintiffs-appellants.

Carla A. Hills, Asst. Atty. Gen., Judith S. Feigin, Atty., Dept. of Justice, Washington, D. C., Samuel K. Skinner, U. S. Atty., Patrick W. O'Brien, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, KILKENNY, Senior Circuit Judge,* and SPRECHER, Circuit Judge.

FAIRCHILD, Chief Judge.

Plaintiff Nucleus of Chicago Homeowners Association (Nucleus) is an Illinois not-for-profit corporation organized "to prevent the damage to neighborhood communities which will result if low-rent housing for low-income families is placed in working-class and middle-class neighborhoods of Chicago." Along with certain Chicago community organizations and individual citizens residing proximate to proposed low income housing sites, Nucleus filed this lawsuit to enjoin the building of low-income housing units by the Chicago Housing Authority (CHA) with the assistance of the United States Department of Housing and Urban Development (HUD) on the ground that HUD officials failed to comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4331 et seq. After a full trial on the merits, the district court entered judgment for the defendants. We affirm.

I

This case is yet another episode in the continuing dispute over the location of public housing in the Chicago metropolitan area. The history of this litigation has been recounted elsewhere. See *Chicago Housing Authority v. Austin*, 511 F.2d 82 (7th Cir. 1975) cases cited in note 1. For our purposes only a few salient facts need be noted. As the responsible federal agency, HUD administers the use of federal funds to construct low rent housing. See The Low-Rent Housing Act, 42 U.S.C. § 1401 et seq. The CHA

* Senior Circuit Judge John F. Kilkenny of the Ninth Circuit is sitting by designation.

is responsible for the construction of low-income housing in the City of Chicago. In order for CHA to receive federal funds, HUD must approve the site selection and construction of low-income housing. In 1969, CHA's site-selection and tenant assignment policies were found to be racially discriminatory. *Gautreaux v. Chicago Housing Authority,* 296 F.Supp. 907 (N.D.Ill.1969). To remedy this discrimination and desegregate the Chicago public housing market, CHA was ordered to construct the next 700 units of public housing at scattered sites in predominantly white neighborhoods composed of less than 15% low-income families. 304 F.Supp. 736 (N.D.Ill. 1969). This judgment order was later amended to require the construction of 1500 units of low-income scattered-site housing. 342 F.Supp. 827 (N.D.Ill.1972). As an initial step to comply with this decree, HUD and CHA have instituted an 84-unit scattered-site housing project.[1] At argument, we were informed that 63 units are presently under construction.

In 1972 plaintiffs filed this suit seeking to enjoin the construction of this public-housing on the ground that HUD officials failed to file an environmental impact statement pursuant to 102 of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332, assessing the impact of siting low-income public housing in middle and working-class neighborhoods. Plaintiffs alleged that low-income housing tenants as a group when compared to the social class represented by the individual plaintiffs possess "a higher propensity toward criminal behavior and acts of physical violence," "a disregard for physical and aesthetic maintenance of real and personal property," and "a lower commitment to hard work." Plaintiffs, in contrast, are alleged to belong to a social class that emphasizes "obedience and respect for lawful authority" and possesses "a much lower propensity for criminal behavior" and "a high regard for the physical and aesthetic improvement of real and personal property." Plaintiffs then charge that the proposed construction of CHA scattered-site housing "will have a direct adverse impact upon the physical safety of those plaintiffs residing in close proximity to the sites, as well as a direct adverse effect upon the aesthetic and economic quality of their lives" so as to "significantly affect the quality of the human environment."

Section 102 of NEPA provides that all "major Federal actions significantly affecting the quality of the human environment" must be accompanied by a detailed statement assessing the environmental impact of the proposed action, 42 U.S.C. § 4332(2)(C).[2] The Council on En-

---

**1.** The project was originally designated ILL. 2–85 and calls for the construction of housing at 15 different sites with no more than 8 units to be constructed at any one site.

**2.** The provisions of NEPA section 102 relevant to this litigation are:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible officials on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

vironmental Quality (CEQ), created pursuant to the Act and charged with the responsibility to oversee the implementation of NEPA, promulgated guidelines directing federal agencies to establish their own procedures to identify those actions requiring environmental impact statements. 36 Fed.Reg. 7724. See 40 C.F.R. § 1500.3(a). In 1971 HUD issued draft regulations, which were effective immediately pending final approval, for the systematic environmental evaluation of the department's programs. In accordance with these regulations, HUD, beginning in July 1972, conducted a special environmental clearance for the first 84 sites CHA proposed to comply with the public housing construction ordered in the *Gautreaux* litigation, and in March, 1973 the agency issued a negative statement, or Finding of Inapplicability, stating that the project posed no significant environmental impacts. See 38 Fed.Reg. 19186.

At trial plaintiffs challenged the sufficiency of HUD's environmental review. Testimony was introduced on the basis of statistical studies to show that a substantial percentage of CHA tenants are female-headed multi-problem families. Such welfare dependent families as a social group, plaintiffs' experts testified, are acutely in need of employment opportunities and particularly dependent upon public programs providing day care facilities, health care, educational services, and youth and family counseling. If these special needs went unsatisfied, it was predicted that CHA tenants would be likely to cause problems for their neighbors, engaging in acts of violence and property destruction. Arguing that

HUD had failed to examine these considerations, plaintiffs concluded that HUD had breached its duty under NEPA to weigh the potential environmental traumas associated with the construction of low-income public housing.

The district court rejected plaintiffs' claim. Doubting the utility of predicting human behavior on the basis of social statistics, the court held that plaintiffs had failed to prove that the social characteristics of the prospective CHA tenants will have a significant impact on the human environment so as to require HUD to prepare an environmental impact statement. This appeal followed.

II

As an initial matter, we note that the parties agree that HUD's determination that an environmental impact statement need not be filed must stand unless it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *First National Bank of Chicago v. Richardson,* 484 F.2d 1369, 1381 (7th Cir. 1973). We have recognized that the national environmental policy expressed in NEPA is "as broad as the mind can conceive" and necessarily includes concern for the quality of urban life. But we have also realized that the environmental problems of the city "are not as readily identifiable as clean air and clean water." *Id.* 484 F.2d at 1377. Given these uncertainties, the case for relying on an agency's good faith judgment is particularly compelling, and we agree that the arbitrary and capricious standard that ordinarily governs review of administrative matters of this sort is

---

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or

special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes; . . . .

**230**

controlling. *Hanly v. Kleindienst,* 471 F.2d 823, 828–30 (2d Cir. 1972), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974. But see *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1320 (8th Cir. 1974) (*en banc*).

■ We dispose first of plaintiffs' contention that HUD violated its duty under NEPA to consider the comprehensive environmental impact of the 1500 unit scattered-site housing program when it confined its environmental analysis to the 84 units the agency has thus far approved. Reliance is placed on HUD and CEQ regulations that charge that proposed actions should be comprehensively evaluated.[3] These regulations, however, plainly vest HUD with discretion to determine the scope of agency action to be subjected to NEPA scrutiny. While a given action "may be more appropriately evaluated in a single environmental clearance," HUD is not compelled to aggregate several projects if, in its judgment, evaluation of the aggregate is not feasible.

Indeed, comprehensive evaluation of specific environmental impact is not possible here. CHA had not selected and HUD had not tentatively approved 1500 proposed housing sites at the time the 84 unit environmental clearance was performed. While no doubt there are environmental considerations common to all sites that are best considered in the aggregate, the fact that by design the sites are scattered throughout the neighborhoods of the city counsels for separate consideration of discrete sites. Cf. *Indian Lookout Alliance v. Volpe,* 484 F.2d 11, 18–19 (8th Cir. 1973). Thus, the scattered-site housing here differs decidedly from the construction of a group of buildings in a single location. See, e. g., *Jones v. Lynn,* 477 F.2d 885, 891 (1st Cir. 1973). In the latter case, prudence may well dictate consideration of the proposed construction as a single unit. Suffice it to say, that though we are cognizant of the benefits of comprehensive planning and do not intend to discourage such analysis, we cannot say that HUD has abused its discretion by choosing to evaluate the impact of CHA housing as housing sites are proposed and approved.

■ Plaintiffs next argue that HUD's decision not to file a full-blown section 102 impact statement was not

---

**3.** The relevant HUD regulation provides:

(5) *Evaluation of comprehensive activities.* Individual actions that are related either geographically or as logical parts in a composite of contemplated actions may be more appropriately evaluated in a single environmental clearance. For example, several subdivisions may form a large new development. Likewise, a comprehensive project may be composed of, or include, several interrelated activities, e. g., development of a new community or redevelopment of a center city area. In these cases, and where feasible, HUD offices should aggregate individual activities into a larger package and environmental evaluation shall concentrate on the broad and cumulative impacts of the larger activity, as well as the project's specific impact of component activities to the extent known.

The comprehensive environmental evaluation will not satisfy the requirements of this Handbook, however, if it is superficial or limited to generalities. When all significant issues cannot be anticipated or adequately treated in connection with the comprehensive assessment as a whole, environmental clearances of more limited scope will be necessary on subsequent, individual actions in order to fulfill the requirements of this Handbook.
38 Fed.Reg. 19185.

CEQ guidelines charge that
(a) The statutory clause "major Federal actions significantly affecting the quality of the human environment" is to be construed by agencies with a view to the overall, cumulative impact of the action proposed, related Federal actions and projects in the area, and further actions contemplated . . . . In considering what constitutes major action significantly affecting the environment, agencies should bear in mind that the effect of many Federal decisions about a project or complex of projects can be individually limited but cumulatively considerable . . . . 40 C.F.R. § 1500.6(a).

It has been held that CEQ guidelines are advisory only and do not have the force of law. *Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 429 (5th Cir. 1973); *Greene County Planning Board v. Federal Power Commission,* 455 F.2d 412, 421 (2d Cir. 1972).

supported by a record sufficiently developed for judicial review of that decision. NEPA does require that an agency affirmatively develop a reviewable administrative record supportive of a decision not to file an impact statement. *First National Bank of Chicago v. Richardson, supra,* 484 F.2d at 1381; *Scherr v. Volpe,* 466 F.2d 1027, 1032 (7th Cir. 1972). But the content and volume of such a record depend upon the particular federal action proposed. A concise statement may be sufficient to support an agency finding of no significant environmental impact if it is grounded on supporting evidence. *Hanly v. Mitchell,* 460 F.2d 640, 646 (2d Cir. 1972), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256.

The gravamen of plaintiffs' complaint is that low-income public housing tenants as a group statistically exhibit a high incidence of violence, law violation, and destruction of property and that HUD failed to consider the adverse impact of these social characteristics on the neighborhoods CHA has chosen for the construction of scattered-site housing. To the extent that this claim can be construed to mean that HUD must consider the fears of the neighbors of prospective public housing tenants, we seriously question whether such an impact is cognizable under NEPA. *First National Bank of Chicago v. Richardson, supra,* 484 F.2d at 1380 n. 13. We agree with the Court of Appeals for the District of Columbia that: "Concerned persons might fashion a claim supported by linguistics and etymology, that there is an impact from people pollution of 'environment,' if the term be stretched to its maximum. We think that type of effect cannot fairly be projected as having been within the contemplation of Congress." *Maryland-National Cap. PK & PL. Com'n v. U. S. Postal Serv.,* 159 U.S. App.D.C. 158, 487 F.2d 1029, 1037 (1973).

In any event we need not resolve the question for it is clear that HUD chose to consider the impact of the scattered-site housing on the social fabric of the recipient communities. In this regard HUD's negative statement relies on several factors to conclude that the project is not likely to produce adverse environmental effects. The low-density design of the housing coupled with the fact that it will be built on vacant lots in compliance with local zoning requirements suggests, for example, that the increased burden on schools, transportation, fire and other community services will be at the most incremental.[4] Moreover, under the *Gautreaux* decree 50 per cent of all dwelling units at a site must be offered first to housing applicants who reside in the surrounding community. Hence, there is little reason to believe the influx of new CHA tenants will drastically alter the character of a neighborhood. Finally, CHA's tenant selection and eviction policies further diminish the possibility that prospective CHA tenants will pose a danger to the health, safety or morals of their neighbors.

Likewise, it is apparent that HUD has considered the project's impact on the physical environment of the target neighborhoods. HUD's negative statement is a 156 page document, consisting of a 9 page narrative and 146 pages of HUD worksheets, comments from the Northeastern Illinois Planning Commission, and various exhibits. The statement considers the problems of solid waste disposal, sewage, air pollution, noise levels, and traffic congestion. Relying on the fact that the proposed housing is essentially "infill" of neighborhoods already built up, the statement concludes that the project will have no significant adverse environmental impact. Thus, in our judgment a satisfactory basis exists for judicial review of the agency's decision.

Plaintiffs, nevertheless, argue that the mere existence of a controversy regarding the impact of scattered-site housing

---

4. Compliance with local zoning regulations and growth consistent with existing growth patterns strongly suggests that a federal action is not environmentally significant. *Maryland-National Cap. PK & PL. Com'n v. U. S. Postal Serv., supra,* 487 F.2d at 1036–37.

requires preparation of a NEPA § 102 environmental impact statement under HUD and CEQ regulations. But the cited HUD regulations only require that the degree of controversy over the environmental consequences of a project should be considered in determining the appropriate environmental clearance procedures that should be followed. 38 Fed. Reg. 19185. An impact statement is not invariably required. CEQ guidelines state that an impact statement must be prepared when the environmental impact of a project is "likely to be highly controversial." 40 C.F.R. § 1500.6(a). But we are not persuaded that the controversy here is such as to require an impact statement.

■■■■ Finally, plaintiffs contend that HUD's environmental analysis was inadequate because HUD failed to use a systematic interdisciplinary approach and did not explore alternatives to scattered-site housing as required by sections 102(2)(A) and 102(2)(D) of NEPA, 42 U.S.C. §§ 4332(2)(A) and (2)(D). These NEPA duties are obligatory whether or not an impact statement is to be filed. *Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123, 1132 (5th Cir. 1974). With respect to HUD's duty to engage in interdisciplinary analysis, plaintiffs specifically assert that the responsible HUD officials never consulted sociologists or read a CHA sponsored study on social problems in public housing entitled *Human Needs in Public Housing*. NEPA, however, does not require that a specific class of experts be consulted or that an agency consider all documents possibly relevant to a given environmental issue. From the negative statement it is clear that HUD, in good faith, considered the impact of the project on the social environment of the site neighborhoods. And, in view of the fact that CHA was under a court order to construct the housing, we cannot say that HUD breached its rather "opaque" duty to engage in interdisciplinary analysis.

With respect to HUD's failure to consider alternative courses of action, plaintiffs' position is equally unfounded. Plaintiffs complain that HUD did not consider the feasibility of broad-scale metropolitan planning and the provision of comprehensive social services to alleviate the problems of low-income public housing tenants. But since the scattered-site housing was court ordered, HUD and CHA have no alternative but to construct the housing. The only sense in which alternatives can be considered is in site selection and even here CHA and HUD must operate within the parameters of the *Gautreaux* decree. See *Trinity Episcopal School v. Romney*, 523 F.2d 88 (2d Cir. 1975). Yet, a recommendation in HUD's negative statement indicating that two sites should be dropped from the project for noncompliance with HUD's Noise Assessment Guidelines pending further environmental analysis suggests that HUD and CHA are exercising some selectivity in site selection. In the context of this case, NEPA requires no more.

Accordingly, the judgment appealed from is affirmed.

Affirmed.