John D'AGNILLO, Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; Jack Kemp, as Secretary of United States Department of Housing and Urban Development; Sam R. Moseley, as New York Regional Administrator of United States Department of Housing and Urban Development; City of Yonkers, New York; Nicholas Wasicsko, as Mayor of the City of Yonkers; Henry Spallone, Nicholas Longo, Harry Oxman, Edward Fagan, Jr., Kevin Condon, Peter Chema, as Councilmen of the City of Yonkers; Neil DeLuca, as City Manager of the City of Yonkers; Municipal Housing Authority of the City of Yonkers; Emmett Burke, as Chairman of the Municipal Housing Authority for the City of Yonkers; Fair Housing Implementation Office of the City of Yonkers; and Karen Hill, as Director of the Fair Housing Implementation Office of the City of Yonkers; Defendants.

No. 89 Civ. 5609 (CSH).

United States District Court,
S.D. New York.

June 8, 1990.

John D'Agnillo, pro se.

Stuart M. Gerson, Asst. Atty. Gen., Dept. of Justice, Civil Div., Washington, D.C. (Sheila Lieber, Raymond M. Larizza, of counsel), for Federal defendants.

Warren J. Bennia, New York City, for Fair Housing Implementation Office of the City of Yonkers and Karen Hill, as Director of the Fair Housing Implementation Office of the City of Yonkers.

Beveridge & Diamond, P.C., New York City (Thomas R. DeRosa, of counsel), for City of Yonkers and Neil DeLuca.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff John D'Agnillo commenced this *pro se* action to enjoin defendants from complying with this Court's consent decrees and related orders in the "Yonkers case," *United States v. Yonkers*, 80 Civ. 6761 (LBS), until the federal defendants and the FHIO had performed environmental studies which plaintiff claimed were mandated by federal statutes and regulations. In a Memorandum Opinion and Order dated April 4, 1990, familiarity with which is assumed, the Court addressed certain defendants' motion to dismiss the complaint for lack of standing, plaintiff's motion to amend his complaint, and plaintiff's motion for a preliminary injunction. 738 F.Supp. 1443.

The April 4, 1990 opinion directed further briefing on certain issues. Those briefs were furnished. The Court heard oral argument on May 9 and at its conclusion permitted a further round of written submissions. Those are also at hand. The Court is now in a position to decide the motion for a preliminary injunction and related issues.

### I

At the outset it is appropriate to recognize the City of Yonkers' transformation from a nominal defendant into a full-fledged plaintiff. That transformation, noted at the beginning of the May 9 hearing, Tr. 2–3, finds further expression in the post-hearing submissions. For the first time, the City offers affidavits of its engineers and other employees in an effort to show irreparable environmental harm if the Court does not, *inter alia*, stay all construction under the consent decree and related orders.

I am not critical of the City's failure to offer such evidentiary material at an earlier date. The federal defendants' suggestions notwithstanding, it is not clear to me that environmental concerns were fully litigated before Judge Sand. On the contrary, his orders seem to preserve the rights of the parties, and the obligation of the federal defendants, to address them in the context of specific housing proposals. The City's witnesses say without contradiction that they were not consulted by the federal defendants with respect to the environmental concerns those witnesses now raise. There is accordingly no question of laches or issue preclusion. While it seems likely that the City would have been receptive to a request by plaintiff D'Agnillo for technical reinforcements at an earlier stage in this litigation, the procedural posture of the case was somewhat strained until more recent events caused the City to run up its true colors.

Accordingly I have considered the City's affidavits as part of the post-hearing submissions. The question arose whether HUD and the FHIO, confronting these factual assertions for the first time, should be given an opportunity to answer them. But in the view I take of the case that is not necessary at present.

### II

Plaintiff D'Agnillo contends that NEPA and the regulations require HUD to perform "a programmatic EIS on the 4,000 units, taking into effect the 200 units as a whole, plus a site specific EIS on the 200 units." Post-hearing brief at 18. In the interim plaintiff asks that all actions of HUD and FHIO to implement the consent

decree be enjoined. The City asks that "actual construction be stayed," pending a cumulative impact analysis of the first 200 units together with the additional 4,000 units, or alternatively a stay of construction until an EIS on the 200 units has been done. Post-hearing brief at 1–2.

A stay of "actual construction" refers as a practical matter only to the 200 units of public housing on the seven designated sites, since no proposals have been obtained for any of the 4,000 subsidized units. The City's present request for injunctive relief is thus of a more limited nature. The immediate issue is whether the record justifies a stay of construction of the 200 units.

■ Plaintiff and the City criticize HUD's environmental reviews. They contend that the EA's are inadequate, and that a comprehensive EIS is required now, either for all 4,200 units or at least for the 200. Assuming without deciding that those criticisms are sound, "injunctive relief does not follow automatically upon a finding of statutory violations, including environmental violations." *Town of Huntington v. Marsh*, 884 F.2d 648, 651 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990) (construing NEPA).[1] In environmental cases as elsewhere, "the basis for injunctive relief is irreparable injury and the inadequacy of legal remedies." *Huntington* at 651 (citing cases). The Second Circuit went on to observe:

> In applying these general equitable standards for the issuance of injunctions in the area of environmental statutes, the Supreme Court has explicitly rejected the notion that an injunction follows as a matter of course upon a finding of statutory violation.
>
> *Ibid.*

*See also Sierra Club v. Hennessy*, 695 F.2d 643, 649 (2d Cir.1982) ("A violation of NEPA does not necessarily require a reflexive resort to the drastic remedy of an injunction."); *Conservation Society of Southern Vermont v. Secretary of Trans-*

*portation*, 508 F.2d 927, 933–34 (2d Cir. 1974), *vac. on other grounds*, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975) ("... it remains within the discretion of a district court to decline an injunction, even where deviations from prescribed NEPA procedures have occurred.").

■ Therefore the question is whether plaintiff and the City have shown imminent irreparable injury as contemplated by NEPA: namely, significant adverse impact upon the quality of the human environment. They have not.

Their effort to do so is buttressed for the first time in the post-hearing affidavits by expert opinions. Richard A. Aglietti, the City Engineer, deals with the sewer system. Robert Leonetti, the City Traffic Engineer, deals with vehicular traffic.

Aglietti discusses the sewer situation within the context of the 4,200 units. He nowhere suggests that construction of the 200 units would cause a sewage disposal problem. It would be difficult for him to do so, given the City's prior response to HUD that bringing the 200 units on line would be manageable.

Leonetti states that the 200 units alone "will result in significant traffic impacts," ¶ 10. The two specific problems offered to support that conclusion both relate to the Wrexham Road site. It is said that traffic generated by that site will have to enter Midland Avenue at an intersection where "left hand turns already pose a significant problem." HUD estimates the 28 Wrexham Road units "will result in 17 A.M. Peak vehicle trips and 18 P.M. Peak vehicle trips on Midland Avenue." Leonetti assumes that half of those vehicles will need to turn left at the Midland Avenue intersection. ¶ 11. The result (rounding the morning figure up to 18) is an additional nine left hand turns in both morning and evening peak traffic hours. That does not rise to the level of irreparable harm. I reach the same conclusion with respect to Leonetti's observation that the present RFP for

---

1. The cited case (*"Huntington II"*) reversed the district court's injunctive order. An earlier opinion, *Town of Huntington v. Marsh*, 859 F.2d 1134 (2d Cir.1988) (*"Huntingtgn I"*), affirmed the district court's grant of declaratory relief.

the Wrexham Road site apparently does not call for enough parking spaces (24 spaces for 28 units). ¶ 12. Assuming more parking spaces should be provided, given the narrow dimensions of the access road, that should be possible. No problems are suggested with respect to any other site.

Counsel for the City reiterate a concern that demolition of the School 4 building will cause an asbestos hazard which HUD has not addressed. Affidavit of Sy Gruza, Esq., at ¶ 4. While D'Agnillo echoes that concern, no expert opinion evidence of an asbestos hazard is offered, and it is incorrect to say that HUD has taken no steps with respect to asbestos at School 4. At HUD's insistence, the developer has retained an asbestos removal contractor and is arranging an appropriate subcontract. HUD Post–Hearing Brief at 16 and Appendix D.

There is no basis in fact or law to stay the construction of the 200 units.

### III

As for the 4,000 subsidized units, I reach the same conclusion but for somewhat different reasons.

The sites for these units have not yet been selected. No RFPs have been drawn up and sent to contractors. No proposals have been made. No construction is on the planning board, let alone imminent. The possibility of immediate irreparable harm does not arise.

Nevertheless, plaintiff and the City argue that the impacts upon the sewer system and traffic can and should be evaluated at this time. All the 4,200 units (200 public and 4,000 subsidized) will be in Yonkers, although we do not now know the street addresses of the 4,000 units. Therefore all the sewage generated by the units will eventually pass into Westchester County's sewage treatment plant located in Yonkers. Aglietti has made calculations of the increase in daily volume in gallons that the residents of 4,200 units would generate, Affidavit at ¶ 15. He expresses this opinion:

In my professional opinion, the City sewer system may not able [sic] to handle a 4,200,000 gallon increase in daily volume in areas, like the Northeast and Southeast areas, designed to accommodate primarily single and two family homes. The cumulative effect of the construction of 4200 new housing unites would overwhelm the sanitary systems creating back-ups and sewer collapse problems, especially if all such developments were to come "on line" in the space of four years. The cumulative effect of that much housing in the geographic areas listed will almost certainly cause adverse environmental problems, creating "back ups" and raising the potential for harm to the Grassy Sprain Reservoir and Saw Mill River.

¶ 16.

I read this opinion to express the *possibility* that the sewer system could not handle the increased load ("may not"), and then to describe the consequences *if* that inability manifested itself.

Aglietti also describes as a "serious situation" the moratorium which at the time of his affidavit was in effect on new sewer extensions, that moratorium being "traceable to the sewage treatment plant exceeding its permit capacity and because of allegations that the county is dumping raw sewage into the Hudson River." *Id.* at ¶ 14.

There is no basis in Aglietti's affidavit for an order enjoining HUD and the FHIO from entering into the *planning* of the 4,000 subsidized units at this time, as opposed to actual construction. One cannot predict with certainty how long the processes of site selections, requests for proposals, and approval of those proposals will take. In the interim, the situation with respect to the sewage system may change. That possibility is illustrated by the reports in the press on May 26, 1990, that the New York State Department of Environmental Conservation (DEC) had on May 25 lifted the moratorium on the construction of new sewer mains to which Aglietti referred in his affidavit. The DEC Commissioner, Thomas Jorling, expressed satisfaction

with assurances given by the Westchester County Executive, Andrew P. O'Rourke, that the county would require communities to take corrective actions "to protect the receiving waters of the Yonkers Joint Sewage Treatment Plant." *The New York Times*, May 26, 1990, at p. 26.

For essentially the same reasons, potential traffic congestion resulting from a total of 4,200 units does not pose a sufficiently imminent threat of irreparable harm to the environment to justify enjoining planning of the 4,000 units.

Plaintiff complains that HUD's alleged violations of NEPA might visit upon Yonkers and its taxpayers liability for third-party environmental claims. That theory of damage is only speculative. In any event, plaintiff cites not authority for the proposition that such concerns fall within the risks NEPA addresses, namely, "substantial damage *to the environment.*" *Town of Huntington v. Marsh, supra* 884 F.2d at 653 (emphasis added). Plaintiff's economic concerns, while understandable, are not cognizable under NEPA.

For the foregoing reasons the motion of plaintiff, supported by the City, for a preliminary injunction will be denied on this record and at this time.

## IV

While no injunction will issue, it remains to consider whether plaintiff is entitled to declaratory relief with respect to these defendants' compliance with NEPA.

Plaintiff's amended complaint prays for declaratory relief at p. 11, subparagraphs (a)-(c). While the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, does not confer subject matter jurisdiction over defendants, the statute does create a remedy available in actions where jurisdiction over the United States or one of its agencies derives from other sources. *Garcia v. United States*, 538 F.Supp. 814, 816-17 (S.D.Tex.1982). The federal defendants at bar do not dispute subject matter jurisdiction.

Environmental cases reflect the interworkings of prayers for declaratory and injunctive relief. *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the seminal Supreme Court case on the necessity for comprehensive environmental impact statements under NEPA, involved applications for "declaratory and injunctive relief," *id.* at 395, 96 S.Ct. at 2723; the court of appeals in *Kleppe* characterized the suit as seeking, *inter alia,* "a declaratory judgment that NEPA was being violated." 514 F.2d 856, 867 (D.C.Cir. 1975). Similarly, in *Town of Huntington v. Marsh, supra,* a case involving the dumping of dredged materials in Long Island Sound under permits issued by the Corps of Engineers, the Second Circuit held that the Corps had violated NEPA but reversed the district court's granting of an injunction. Thus it is possible for district courts to declare obligations while denying injunctions. Indeed, as plaintiff stresses, it is desirable to do so, in order that the agency's statutory obligations be judicially defined as early in the development and construction process as the circumstances allow. *See Huntington I* at 1143.

As noted, plaintiff and the City contend that NEPA and the pertinent regulations require HUD at this time to prepare a comprehensive EIS for all 4,200 units. They also contend that an EIS on the 200 units is required. In the Court's view, it is appropriate to address those issues now.

### The 200 Public Housing Units

Under the funding arrangements for the 200 public housing units, HUD itself is directly responsible for compliance with NEPA. In the Court's prior opinion and order, I ordered further briefing on the question whether HUD must comprehensively review the environmental impact of the seven public housing sites. 738 F.Supp. at 1451-53.

HUD's position has been and remains that no comprehensive review of the seven sites was required. The question is one of "aggregation." The HUD regulation applicable to these particular housing units is 24 C.F.R. § 50.21(a), which provides in part:

Individual actions which are geographically related and are logical parts of a

composite of contemplated actions shall be evaluated together.

HUD contends that the seven public housing projects need not be evaluated together because they are not "geographically related" within the meaning of that aggregation rule.

However, perhaps entertaining some inner doubts that the Court would accept that argument, HUD responded to the prior opinion by conducting a Supplemental Environment Review ("SER") which constitutes a comprehensive assessment of the potential cumulative environmental impacts of the seven projects.

The SER pinpoints the seven sites on a map of Yonkers, and argues that they are not "geographically related" because they "are essentially located in different neighborhoods as can be defined by established city planning criteria." SER dated April 30, 1990 at 1. Nonetheless, the SER goes on to assess the "aggregation of relative environmental factors." Sensibly enough, the SER is concerned not with the impact upon the environment of a particular site standing alone—this is the function of the EA's—but rather upon conditions to which all seven sites, once the units are built, would contribute in the aggregate. HUD identified five such areas: (a) water supply; (b) waste water/sewage system; (c) traffic implications; (d) air quality implications; and (e) impacts upon the public school system. *Id.* at 2.

As to water supply and the waste water/sewage system, HUD relied upon the City's prior acknowledgement, following an aggregate analysis of its own, that existing City utilities in the immediate area of all seven housing sites would adequately service the proposed developments. The City's engineer, Mr. Aglietti, reached a comparable conclusion with respect to the adequacy of the existing sewer systems to accept sewer hook-ups. After the City's first evaluation one of the seven sites, the Valentine Street site, was withdrawn by the Catholic Church and replaced by the Grammercy site on Central Park Avenue. The Grammercy site required the extension of a sewer line, not simply a hook-up. The

State's moratorium was in effect at the time, but this Court (Judge Sand) obtained an exemption to the moratorium. Based upon the City's own evaluations, there is no reason to believe that construction of the 200 public housing units pose water supply or waste water/sewage system problems. SER at 3–4.

As to impacts upon the public school system, the SER observed that Yonkers is currently under a court order to desegregate its school system. Thus any change in school attendance necessitated by the development by the public housing would be reflected in a modification to the desegregation order. In those circumstances, HUD concluded that *no submission from the Yonkers Board of Education discussing the impact of the project on school enrollment was necessary,* and HUD undertook no such study of its own, concluding that: "Based upon the desegregation order, an aggregated evaluation is achieved." *Id.* at 4.

As to air quality impacts, the HUD Environmental Clearance Officer, Douglas R. Manley, conferred with an environmental engineer from the United States Environmental Protection Agency and made calculations of the impacts of present vehicular emissions based upon miles per year. HUD reached this conclusion:

*Conclusion:* In discussing with U.S.E. P.A. Staff the nature of these 7 scattered Public Housing Sites and the fact that these sites range from 14 units to a maximum of 48 units (an average of 28–29 units per site), it was concluded that the contributions of vehicle trips, in the aggregate, are not significant in adding to levels of pollutants. Reaching this conclusion is also based upon the fact that the 7 scattered housing sites are not geographically related and their contributions to air quality levels affect different sectors of the City.

*Note:* The above air quality impacts are based upon the "worst case scenario" that have summed AM & PM generated trips; since AM & PM peaks are separated in time, contributions to existing pollutant level should be *further reduced*.

SER at 5–6.

As to traffic implications, HUD received data from the New York State Department of Transportation and the Westchester County Department of Public Works— Traffic and Highway Safety. Manley also consulted a New York Regional Data Map from HUD's Office of Environment and Energy; previous HUD noise assessments; a report of the Institute of Traffic Engineers; and conferred with a traffic engineer. HUD made site calculations based upon "trip generations" at each of the seven sites, and compared the trip generations resulting from construction of the public housing with the demonstrated present vehicular traffic flow in each of the particular areas. Although the public housing units would additional traffic, "the impacts are considered to be minor in nature." *Id.* at 7. The SER stated:

> *Conclusion:* Considering the scatteration of the 7 sites, the estimated trips generated, and their proximity, generally, to major traffic flows in this part of the City, it is my opinion, in the aggregate, that overall traffic volumes should be adversely affected by the limited vehicles from these sites entering the total stream of vehicular traffic. It must be recognized, however, that two of the sites (Whitman School and Helena Ave.) will need to traverse local streets and will add, what it is believed to be, minor impacts to these areas.
> *Ibid.*

This SER is the functional equivalent of a comprehensive FONSI. Accordingly there is no purpose in entering a declaratory judgment that an EIS should be performed. Plaintiff and the City are not satisfied with HUD's methodology or the environmental conclusions HUD reaches. But the court's power to review such matters is limited. That is the teaching of *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980)(*per curiam*).

*Karlen* involved HUD's redesignation of a proposed site for middle-income housing as one for low-income housing. Parties interested in the middle-income housing development claimed, *inter alia*, that HUD had violated NEPA. The district court rejected the claim. The court of appeals, while agreeing that HUD was not required to prepare a full-scale EIS under § 102(2)(C), faulted the agency for noncompliance with § 102(2)(E), which requires consideration of "appropriate alternatives." On remand, HUD prepared a lengthy report entitled "Special Environmental Clearance," 444 U.S. at 225, 100 S.Ct. at 499, which conceded that the agency might not have considered all possible alternatives, but concluded that any environmental costs resulting from implementing the project were insufficient to justify further studies or a mandated substitution of sites. The district court accepted HUD's conclusions, but the Second Circuit vacated and remanded again with directions, in effect, to go back to the drawing board.

The Supreme Court reversed *per curiam*. The Court said that the court of appeals "purported to recognize that its role in reviewing HUD's decision was defined" by the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) which provides that agency actions should be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...," but then looked to NEPA for "the substantive standards necessary to review the merits of agency decisions ..." *Karlin v. Harris*, 590 F.2d 39, 43 (2nd Cir.1978), quoted at 444 U.S. at 227, 100 S.Ct. at 499.

Proceeding in that fashion constituted error, the Court held in *Karlen*. While NEPA establishes "significant substantive goals for the Nation," it imposes upon agencies duties that are "essentially procedural." *Ibid.* (*citing and quoting Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)). NEPA's function is "to insure a fully informed and well-considered decision," but not one with which judges would agree had they been making the agency decisions. *Karlen* concludes:

> .... once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to

insure that the agency has considered the environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21 [96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576] (1976). *See also FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326 [96 S.Ct. 579, 46 L.Ed.2d 533] (1976).

In the present litigation there is no doubt that HUD considered the environmental consequences of its decision to redesignate the proposed site for low-income housing. NEPA requires no more. *Id.* at 227–28, 100 S.Ct. at 500 (footnote omitted).

*See also Huntington I* at 1143 ("NEPA mandates no substantive outcomes".)

In the case at bar, HUD has satisfied, however grudgingly, the "essentially procedural" requirements of NEPA by performing the SER. In the SER, to paraphrase *Karlen*, "HUD considered the environmental consequences of its decision to build the designated number of public housing units at the seven designated sites. NEPA requires no more." As is the case with injunctive relief, plaintiff is not entitled to declaratory relief in respect of the 200 public housing units.

*The 4,000 Subsidized Housing Units*

█ Under the statutory funding provisions, the 4,000 subsidized housing units will be constructed under the Community Development Block Grant ("CDBG") Program created by the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq.* Defendant FHIO has been created as a separate grantee of CDBG funds. Accordingly FHIO is the entity responsible for compliance with NEPA prior to committing funds to any particular project. HUD has reminded FHIO of that obligation in a letter dated September 30, 1988, which reads in part:

Please be advised that funds for activities subject to the provisions of 24 CFR Part 58 (Environmental Review Procedures for the Community Development Block Grant Program) may not be obligated or expended unless a release of funds has been approved in writing by Environmental Certification.

24 C.F.R. Part 58 contains HUD's regulations governing environmental review procedures for CDBG grants. The question of aggregation is addressed in 24 C.F.R. § 58.32(a), which provides:

**Project aggregation.**

(a) A recipient must group together and evaluate as a single project all individual activities which are related either geographically or functionally, or are logical parts of a composite of contemplated actions. The environmental review of a multi-year project shall encompass the entire multi-year scope of activities. This applies even if some of the activities are to be funded by other than Title I or Section 17 funds or carried out by someone else.

In addition, the Council on Environmental Quality has promulgated regulations binding upon all federal agencies which address the question of "connected" actions for environmental impact purposes. The CEQ regulations at 40 C.F.R. § 1508.25(a)(1) provide that actions are "connected if they: ... (iii) Are interdependent parts of a larger action and depend on the larger action for their justification." The Second Circuit has looked to this regulation in determining whether a single EIS is required under NEPA. *Huntington I* at 1142; *Hudson River Sloop Clearwater v. Department of the Navy*, 836 F.2d 760, 763 (2d Cir.1988).

In the case at bar, HUD and FHIO contend that for various reasons a comprehensive EIS for the 4,000 units (or those units in conjunction with the 200 public housing units) is not required. *Karlen* is not applicable to that contention. *Karlen* holds that if the responsible agency has considered comprehensive environmental consequences, thereby fulfilling the procedural requirements of NEPA, the courts cannot second guess the substantive conclusions. On this aspect of the case at bar, however, the agencies contend that no comprehensive evaluation is possible or required. The issue is whether that contention conforms

to NEPA's procedural requirements. On that question the leading Supreme Court case is *Kleppe v. Sierra Club, supra.*

In *Kleppe* environmental groups challenged the action of the Secretary of the Interior in issuing coal leases, approving mining plans, and taking other actions to enable private companies and public utilities to develop coal reserves on federally owned or controlled land. They claimed that § 102(2)(C) of NEPA required the preparation of a comprehensive EIS in respect of the coal reserves of the "Northern Great Plains region," which embraced parts of Wyoming, Montana, North Dakota, and South Dakota. The Court rejected the claim. The first point of decision was that NEPA required an impact statement only in respect of a "recommendation or report on *proposals* for … major Federal actions significantly affecting the quality of the human environment," and there was no evidence in the record of an "existing or proposed plan or program on the part of the federal government for the regional development of the area described in [plaintiff's] complaint." 427 U.S. at 399–400, 96 S.Ct. at 2725–26.

Secondly, the Court held that plaintiff's "desire for a regional environmental impact statement cannot be met for practical reasons. In the absence of a proposal for a regional plan of development, there is nothing that could be the subject of the analysis envisioned by the statute for an impact statement." *Id.* at 401, 96 S.Ct. at 2726.

Up to that point in its opinion, the Court had dealt only with the reasoning of the court of appeals, which the Court reversed. A time came, however, when the Court addressed an argument plaintiffs made to the court of appeals but that court did not reach. Plaintiffs in *Kleppe* argued that even without a comprehensive federal plan for the development of the Northern Great Plains, "a 'regional' impact statement nevertheless [was] required on all coal-related projects in the region because they are intimately related." The Court addressed that argument "as an attack upon the decision of the [federal defendants] not to prepare one comprehensive impact state-

ment on all proposed projects in the region." *Id.* at 408–09, 96 S.Ct. at 2729–30.

The Court began its analysis by generally agreeing with plaintiffs' "basic premise that § 102(2)(C) may require a comprehensive impact statement in certain situations where several proposed actions are pending at the same time." Construing § 102(2)(C) of NEPA, the Court said:

By requiring an impact statement Congress intended to assure such consideration during the development of a proposal or—as in this case—during the formulation of a position on a proposal submitted by private parties. A comprehensive impact statement may be necessary in some cases for an agency to meet this duty. Thus, when several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action.

*Id.* at 409–10, 96 S.Ct. at 2730 (footnotes omitted).

At that point in the text the Court dropped footnote 20:

At some points in their brief [plaintiffs] appear to seek a comprehensive impact statement covering contemplated projects in the region as well as those that already have been proposed. The statute, however, speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects.

(emphasis in original).

The Court rejected plaintiffs' alternative theory. It could not be said that the feder-

al defendants' choices of procedure were "arbitrary," as a practical matter. "Even if environmental interrelationships could be shown conclusively to extend across basins and drainage areas, practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements." The Court concluded that plaintiffs' "contention as to the relationships between all proposed coal-related projects in the Northern Great Plains region does not require that [defendants] prepare one comprehensive impact statement covering all before proceeding to approve specific pending applications." *Id.* at 414, 96 S.Ct. at 2732. At that point in text, the Court dropped footnote 26:

> Nor is it necessary that [defendants] always complete a comprehensive impact statement on all proposed actions in an appropriate region before approving any of the projects. As [defendants] have emphasized, and [plaintiffs] have not disputed, approval of one lease or mining plan does not commit the Secretary to approval of any others; nor, apparently, do single approvals by the other petitioners commit them to subsequent approvals. Thus, an agency could approve one pending project that is fully covered by an impact statement, then take into consideration the environmental effects of that existing project when preparing the comprehensive statement on the cumulative impact of the remaining proposals. *Cf.* n. 20, *supra.*

More recently, the Second Circuit has considered the need for comprehensive impact statements within the context of the regulations. The Second Circuit construed 40 C.F.R. § 1508.25(a)(1)(iii) in *Huntington I* and *Sloop Clearwater.* The test in this circuit of "relatedness" under the regulation "is whether the project has independent utility." *Huntington I* at 1142. In that case, the Corps of Engineers conceived of its "project" as the designation of a disposal site, with the issuance of permits to use the site constituting a distinct and unrelated action. The court of appeals rejected that argument as "merely a variant of 'segmentation' which has been uniformly rejected by courts," and held:

The designation of WLIS III clearly has no utility apart from its planned usage as a disposal site. Designation of a site to contain a contemplated load of 646,000 cys of waste material surely was related to the then-pending applications to dump 86,000 cys and the Corps' own plans to dump the remaining 560,000 cys. It is simply untenable to view site designation as distinct from issuing permits to use the site. We therefore agree with the district court that the Corps violated NEPA by not including a particularized discussion of the types and quantities of sediments to be dumped at WLIS III. *Ibid.*

In *Sloop Clearwater*, environmentalists sought to enjoin dredging and pier construction by the Navy with respect to the proposed Staten Island homeport for a battleship group, pending compliance with NEPA. The Navy had complied with NEPA with respect to dredging and pier construction, but had not yet complied with the statute in its plans for housing for home port personnel and their families. Plaintiffs contended that the housing and operational aspects of the proposed homeport were connected actions which had to be considered in a single EIS. The Second Circuit disagreed. In addition to considering 40 C.F.R. § 1508.25(a)(1)(iii), the court of appeals considered subsection (ii), which provides that actions are connected if they: "Cannot or will not proceed unless other actions are taken previously or simultaneously."

The proposed federal actions were not "connected" under subsection (ii) because, as the district court found, "[e]ven if the Navy is unable to provide any family housing ... military necessity requires it to proceed with the project." Given that finding, the court of appeals concluded that it was inappropriate for the housing and the operational aspects of the homeport to be deemed "connected" under subdivision (ii). 836 F.2d at 763. That same finding barred a conclusion of connection under subdivision (iii), since "the proper test for interdependence is one of independent utility", and "it is clear that the two actions are not

interdependent under subdivision (iii), since the operational aspect of the homeport has the requisite dependent utility." *Id.* at 764.

HUD and FHIO stress that no sites have been selected and no construction plans drawn up for any of the 4,000 subsidized housing units. Consequently, they contend, there are no "proposals" presently in being, and a comprehensive EIS is not required under the holding of *Kleppe*. HUD and FHIO also argue that since no sites have been selected, an evaluation of aggregate environmental impact is not feasible, relying upon *Nucleus of Chicago Home Owners Association v. Lynn*, 524 F.2d 225 (7th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). *See* this Court's prior opinion at 738 F.Supp. at 1450–51.

The matter is complicated, however, by the particular circumstances of the case at bar, from which HUD derives an alternative argument. HUD observes correctly that since no sites for the long-term project of 4,000 subsidized units have yet been identified, the only type of comprehensive environmental assessment that "could conceivably be conducted would be one focusing exclusively on those cumulative environmental impacts that are solely a function of the number of units." Federal defendants' reply brief to City brief at 9. The waste water disposal system falls within that category, since all sanitary sewers within the City of Yonkers feed eventually into the Westchester County sewage treatment plant located in Yonkers (which also treats sewage from other Westchester communities). Increased vehicular traffic within the Yonkers streets is another environmental impact which is "solely a function of the number of units." But HUD argues that the number of 4,200 units is mandated by this Court's prior remedial orders, and HUD could not reduce it, citing for that proposition *Nucleus of Chicago Home Owners Association, supra,* and *Sworob v. Harris,* 451 F.Supp. 96 (E.D.Pa. 1978). From that premise HUD argues:

> Thus, the only alternative that could be studied in an environmental assessment or an EIS would be to reduce the total number of units. That option, however, is legally unavailable and, therefore, it would be utterly pointless to study it. Reply brief at 10.

At oral argument HUD's counsel, responding to a hypothetical posed by the Court, which assumed (there is no present evidence) that the addition of 4,200 units "would cause the sewage disposal system of the City of Yonkers to break down entirely and the City would become awash with sewage," responded: "If the 4,000 unit number turns out to be too much then the problem should be addressed to Judge Sand not to HUD." Tr. 42–43.

In this litigation I will assume that the remedial orders mandate the construction of 4,200 additional housing units in Yonkers. But that mandate has practical consequences in the environmental context. It means that, at least with respect to the number of additional units, one can identify the functional equivalent of a single "proposal." Particular, site-oriented impacts upon the immediately surrounding environment must necessarily await the designation of the sites themselves. Until sites are selected, there can be no proposals sufficient under *Kleppe* to trigger an appraisal of those environmental factors. But the case at bar differs from *Kleppe,* since the total number of additional units is now known, and cumulative environmental impacts resulting solely from that number can be identified. Certainly that is so with respect to sewage disposal; arguably it is so with respect to traffic.

*Kleppe* holds that when "several proposals" will have a "cumulative or synergistic environmental impact," their environmental consequences "must be considered together." The Second Circuit cited that language in *Huntington I* in holding that the disposal site and the wastes to be deposited there must be considered in a single EIS. 859 F.2d at 1142. The CEQ guidelines provide that an EIS should analyze cumulative impacts when to do so is "the best way to assess adequately the combined impacts of similar actions." 40 C.F.R. § 1508.25(a)(3). The HUD regulation governing CDBG grants differs from its counterpart in the public housing context. 24

C.F.R. § 58.32(a) requires evaluation "as a single project" of "all individual activities which are related either geographically *or* functionally, or are logical parts of a composite of contemplated actions." (emphasis added). The command is in the disjunctive. The scattered sites of the 4,000 subsidized units may not prove to be "geographically" related; but, together with the 200 public housing units, they will certainly be "functionally" related, at least with respect to the production of sewage. Each subsidized housing unit may well have "independent utility," so that the units would not be regarded as related under 40 C.F.R. § 1508.25(a)(1)(iii); but the requirement of a comprehensive EIS may be derived from various strands in the statutory and regulatory tapestry, and I find sufficient basis for the requirement in the case at bar, given HUD's position that all 4,200 units must be built within the boundaries of the City.

Since the mandated construction of 4,200 units may fairly be analogized to a single proposal for federal action of the sort triggering NEPA, at least with respect to some identifiable conditions, there is Second Circuit authority for conducting a comprehensive EIS sooner rather than later, at least to the extent that environmental impacts are reasonably foreseeable. In the *Huntington* litigation, the Corps of Engineers argued that the EIS of a dumpsite need not and could not include consideration of the types, quantities and cumulative effects of dredged wastes to be deposited there. The court of appeals rejected that argument. It accepted that the agency was not required to "ferret out every possible alternative," or include in the EIS "mere speculation as to future events," but stressed that "the possibility that the WLIS III site would be utilized by two federal projects involving 560,000 cys of waste was certainly foreseeable." *Huntington I*, 859 F.2d at 1141. The court also said:

We do not take issue with particular conclusions reached by an agency after it has taken a "hard look" at environmental factors involved. *See City of New York v. U.S. Dep't of Transp.*, 715 F.2d [732] at 748 (2nd Cir.1983) (NEPA mandates no particular substantive outcomes).

However, it is improper to *defer* analysis of the types, quantities and cumulative effects of waste dumping when designating a new waste disposal site.

*Id.* at 1143 (emphasis in original).

The prospective additional waste of Yonkers stands *in pari materia* with the prospective waste in *Huntington.* We do not know where the scattered-site subsidized housing units will be built in the City, but we do know that, under present conditions at least, all the sanitary waste their residents generate will flow to one disposal site.

HUD makes an alternative argument with respect to the sewage problem. The Federal Clean Water Act, 33 U.S.C. § 1251 *et seq.*, requires the governors of each state, following publication of federal guidelines, to identify each area within the state "which, as a result of urban-industrial concentrations or other factors, has substantial water quality control problems," and, in respect of each such area, to designate its boundaries and an organization "capable of developing effective areawide waste treatment management plans ..." § 1288(a)(2). The statute also creates a National Pollutant Discharge Elimination System which requires a permit for the discharge of pollutants into navigable waters. The federal Environmental Protection Agency ("EPA") is authorized to delegate permit issuing responsibility to the states; in New York that delegation has in fact been made to the New York State DEC. Thus the waste water treatment facility serving Yonkers and a number of other Westchester County communities, operates under a permit issued by DEC.

In these circumstances, HUD argues that "it would be both inappropriate and wasteful" for HUD to undertake "an independent analysis of the capacity of the water treatment facility." Post-argument brief at 7. HUD relies upon *New England Coalition v. United States Nuclear Regulatory Commission*, 582 F.2d 87 (1st Cir. 1978), which involved the NRC's proposal to construct a nuclear power plant at Seabrook, New Hampshire. The NRC bore the responsibility for complying with

NEPA, but the EPA was also involved, because the statutory scheme required that before the plant could be put into operation it must get a license from the EPA to discharge thermal pollution into the waters around Seabrook. The EPA could not issue such a license unless it at first determined that the plant's design could assure "the protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in and on the body of water into which the discharge is to be made." 33 U.S.C. § 1326(a); *see* discussion 582 F.2d at 98.

In those particular circumstances, the First Circuit accepted the NRC's argument that NEPA did not require that agency to perform an independent evaluation of the plant's environmental impact upon the navigable waters. The First Circuit said on that point:

> There is no dispute that NEPA requires the NRC to factor any anticipated marine pollution into its cost-benefit analysis of the Seabrook application. The NRC accepts this duty but argues that it is justified in refusing to reach an independent judgment about matters determined by the EPA because those matters are committed by law to the special expertise of the EPA and because repetitious adjudication of the issue would be wasteful. The NRC argues, and we agree, that it can properly limit its concern to deciding whether permits should be issued given the aquatic impact as determined by EPA and other environmental impacts as determined by NRC.
>
> *Ibid.*

HUD analogizes the federal EPA in *New England Coalition* to the state DEC in the case at bar, and argues from that analogy that neither HUD nor the FHIO are required to give any separate consideration to the cumulative effect of sewage resulting from the 4,200 units. I agree that the circumstances in *New England Collation* are somewhat similar, but I do not think that case carries HUD to the conclusion of its argument. The licensing authority exercised by the EPA in *New England Coalition* squarely and fully addressed the environmental concern which the NRC would otherwise have been required to confront. In the case at bar, the permit authority delegated to DEC addresses only the problem of discharge of pollutants into the navigable waters. *See* 33 U.S.C. §§ 1311, 1312, 1342. But a legitimate concern arises with respect to a potential "back-up" of wastewater into the streets and homes of Yonkers: pollution, as it were, at the other end of the pipeline. The problems may be related within the broader context of waste treatment management, but they have separate elements, beyond the scope of the single issue presented in *New England Coalition*.

Therefore I reject HUD's argument that no consideration need be given to the comprehensive environmental impact of sewage at this time. That is not to say that, in beginning to address the issue, FHIO and HUD cannot consult with the DEC, as indeed HUD consulted with other state agencies on the analysis of traffic impact in the SER.

I conclude that plaintiff is entitled to a declaratory judgment that NEPA and the pertinent regulations require preparation of an EIS at this time with respect to the impact of 4,200 additional housing units in the City of Yonkers upon the City's waste disposal system.

Plaintiff and the City make the same argument with respect to traffic. There the argument is less clear-cut. As the SER on the 200 public housing units shows, analysis of traffic impact involves the streets in the immediate vicinity of the particular site, and also the impact upon the City's main thoroughfares. It is not possible to conduct the first analysis until the sites have been chosen. But the affidavit of traffic engineer Leonetti focuses upon Central Park Avenue, which he describes as "the major North–South thoroughfare in the City." Affidavit at ¶ 5. Leonetti calculates that at present approximately 36,000 vehicle trips are made on Central Park Avenue daily. He further calculates that the development of 4,200 new housing units within the City boundaries would result in a 35% increase in

traffic volume on Central Park Avenue. *Id.* at 5–7. At first blush this would seem to be a high estimate, given the overall population of the City; I would be surprised if the residents of the contemplated 4,200 units would increase the overall car-driving population of Yonkers by 35%. However, the present state of the record permits no more informed judicial analysis than that; and the point presently at issue is HUD's refusal to even consider the matter.

I conclude that plaintiff is entitled to a declaratory judgment that NEPA and the pertinent regulations require the FHIO and HUD to attempt an EIS with respect to the cumulative impact of 4,200 additional housing units upon vehicular traffic in the main thoroughfares of Yonkers (as opposed to the streets and intersections in the immediate vicinity of sites yet to be selected). Such an EIS may ultimately prove to be impractical. But I conclude that the agencies are required to try, and to try at this time.

In reaching these conclusions, I reject HUD's argument that the mandated number of housing units relieves it and the FHIO from any obligation to prepare any cumulative environmental impact statements with respect to numbers-related conditions.

The Yonkers litigation, began ten years ago and augmented by the case at bar, involves two areas of public policy: fair housing, and protection of the environment. Assuming *arguendo* that full implementation of the remedial housing order would have a significant adverse impact upon the environment, it does not follow that environmental concerns would predominate. In *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542, the Supreme Court said of an analogous environmental statute:

> Congress clearly did not state in ANIL-CA that subsistence uses are always more important than development of energy resources, or other uses of federal lands; rather, it expressly declared that preservation of subsistence resources is *a* public interest and established a frame-

work for reconciliation, where possible, of competing public interests.

480 U.S. at 545–46, 107 S.Ct. at 1404 (footnote omitted) (emphasis in original). NEPA does not require that a federal agency, "in selecting a course of action, must elevate environmental concerns over other appropriate considerations." *Karlen, supra,* at 227, 100 S.Ct. at 500. Still less need a district court do so. In every case, the Chancellor in equity "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco, supra,* at 542. "Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between the competing claims." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (*citing and quoting Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944)) (Federal Water Pollution Control Act gives district court discretion to grant or deny an injunction for statutory violations). "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles, supra,* at 329, 64 S.Ct. at 592.

While these cases for the most part consider the propriety of a particular injunctive order, their rationale will inform this Court in the case at bar, should it eventually become necessary to reconcile or choose between competing public interests.

This case contains at least the potential—I put it no higher than that—of competition between the public interests of fair housing and environmental protection. The present procedural posture is awkward, with one judge of the Court presiding over the fair housing aspect of the litigation, and another over the environmental aspect. Clearly only one judge can reconcile or resolve any conflict between those competing public interests. In my view, at least, that must be the judge who

has presided over the fair housing litigation for the past decade. But to provide the background for an informed evaluation of potentially competing public interests, it is necessary that the cumulative environment impact assessments contemplated by NEPA and the regulations be timely performed. It is in aid of that objective that I grant plaintiff relief to the extent indicated in this Opinion. In all other respects, his motion is denied.

Settle Order and Judgment consistent with this Opinion on ten (10) days' notice.

It is SO ORDERED.