29 F.3d 40
 UNITED STATES of America, Plaintiff-Appellee,
Yonkers Branch-NAACP, Plaintiff-Intervenor-Appellee,
v.
YONKERS BOARD OF EDUCATION; U.S. Department of Housing and
Urban Development; Martin C. Barrell; Jorge L. Battista;
Board of Regents of New York; Shirley C. Brown; R. Carlos
Carballada; Salvadore Sclafini; Thomas Sobol; Lora
Bradley Chodos; State of New York; Thomas Frey; Willard
A. Genrich; Norma Gluck; Emlyn I. Griffith; Vincent Tese;
Mimi Levenlieber; Yonkers Community Development Agency;
Floyd S. Linton; Louise P. Matteoni; James McCabe; Edward
Meyer; Urban Development Corporation of the State of New
York; Samuel R. Pierce; Adelaide L. Sanford; Mario Cuomo,
as Governor of the State of New York and Floyd S. Linton, Defendants,
v.
CITY OF YONKERS, Defendant-Appellant.
 No. 1528, Docket 93-6342.
 United States Court of Appeals,
Second Circuit.
 Argued June 13, 1994.
Decided July 5, 1994.
 
 Raymond P. Fitzpatrick, Jr., Birmingham, AL (R. Scott Clark, Helen Kathryn Downs-Smith, Johnston, Barton, Proctor, Swedlaw & Naff, Birmingham, AL, of counsel), for defendant-appellant.
 Lisa C. Wilson, Dept. of Justice, Washington, DC (James P. Turner, Acting Asst. Atty. Gen., David K. Flynn, Dept. of Justice, Washington, DC, of counsel), for plaintiff-appellee U.S.
 Michael H. Sussman, Goshen, NY, for plaintiff-intervenor-appellee Yonkers Branch-NAACP.
 Before: MCLAUGHLIN and JACOBS, Circuit Judges, and WEINSTEIN,* Senior District Judge.
 PER CURIAM:
 
 
 1
 The City of Yonkers (the "City") appeals from a supplemental order entered in the United States District Court for the Southern District of New York (Leonard B. Sand, Judge ) adopting additional measures designed to remedy unconstitutional housing segregation. On appeal, the City argues that the district court abused its discretion and violated principles of federalism by (1) rejecting its alternative proposal, and (2) appointing a Housing Special Master.
 
 
 2
 We affirm.
 
 
 3
 * The story of the Yonkers desegregation litigation has been told several times in our prior opinions. See, e.g., United States v. Yonkers Bd. of Educ., 927 F.2d 85 (2d Cir.1991); United States v. Yonkers Bd. of Educ., 837 F.2d 1181 (2d Cir.1987), cert. denied, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). We recount only those facts believed necessary to an understanding of this latest chapter.
 
 
 4
 Following a lengthy bench trial in 1983 and 1984, the district court found that the City unconstitutionally segregated its housing and public schools by relegating virtually all of its subsidized housing to the southwest portion of the City. See United States v. Yonkers Bd. of Educ., 624 F.Supp. 1276 (S.D.N.Y.1985). To remedy the constitutional violation, the court entered the Housing Remedy Order ("HRO"). See United States v. Yonkers Bd. of Educ., 635 F.Supp. 1577 (S.D.N.Y.1986). Part II of the HRO required the City to establish a Fair Housing Office to administer and implement a fair housing policy. Id. at 1577-79. Part VI required the City to develop a long-term plan for the creation of additional subsidized family housing in east or northwest Yonkers. Id. at 1582.
 
 
 5
 In January 1988, the parties negotiated a consent decree in which the City agreed to the creation of 800 units of subsidized housing by 1992. In June 1988, the district court entered the Long Term Plan Order ("LTPO"), setting forth the specific steps the City must take to comply with Part VI of the HRO. The LTPO also expanded the role of the Fair Housing Office, and renamed it the Fair Housing Implementation Office ("FHIO").
 
 
 6
 The LTPO proved inadequate to the task, however, and all parties agreed that modifications would be necessary to ensure the successful integration of Yonkers. The NAACP, as plaintiff-intervenor, moved in 1991 to require the City to adopt additional remedial measures. The City cross-moved for an order vacating or modifying the consent decree and the LTPO.
 
 
 7
 At the district court's invitation, the City in 1992 proposed an alternative to the LTPO. The City's plan set a goal of 709 subsidized housing units within four years, using 450 units of existing housing. The district court agreed with the City that converting existing housing was preferable to (and cheaper than) constructing new units, and gave the City eight months to work with the FHIO to demonstrate the feasibility of its alternative plan. Following this demonstration period, the district court held a hearing on the merits of the City's plan.
 
 
 8
 The district court found that the City's plan to use existing housing "could not realistically achieve even a small percentage of the 450 units it projects." The court also observed that "disharmony" between the City and the FHIO, as well as political pressures exerted on the City, substantially impeded the City's progress. As for the new construction component of the City's plan, the court faulted the plan for its inefficient use of sites and its exclusive reliance on "owner occupied" townhouses.
 
 
 9
 Based on its findings, the district court entered a modified remedial order, titled the "Supplemental Long Term Plan Order Adopting Additional Remedial Measures" (the "Supplemental LPTO"). For the most part, the Supplemental LTPO rejects the City's plan, and more closely resembles the FHIO's proposal. The Supplemental LTPO adopts a goal of utilizing 250 existing housing units. In addition, the Supplemental LTPO provides for the appointment of a "Housing Special Master" to coordinate and implement the order.
 
 
 10
 The City now appeals from the Supplemental LTPO.
 
 II
 
 11
 The City argues that the district court abused its discretion by rejecting its alternative plan. The City maintains that a proper respect for principles of federalism required the district court to defer to its plan, as it represented a reasonable, good-faith effort to remedy the constitutional violation. We disagree, particularly in view of the eight years that have elapsed since the HRO was entered.
 
 
 12
 Once a constitutional violation has been established, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). The scope of our review of an order designed to remedy a long-standing constitutional violation is accordingly narrow: "The district court, which has 'first hand experience with the parties and is best qualified to deal with the flinty, intractable realities of day-to-day implementation of constitutional commands,' must be given a great deal of flexibility and discretion in choosing the remedy best suited to curing the violation." Yonkers, 837 F.2d at 1236 (quoting United States v. Paradise, 480 U.S. 149, 184, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987) (internal quotation marks and citation omitted)).
 
 
 13
 Without question, "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." Missouri v. Jenkins, 495 U.S. 33, 51, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990). And, we readily agree with the City that "local authorities have the 'primary responsibility for elucidating, assessing and solving' the problems of desegregation." Jenkins, 495 U.S. at 51, 110 S.Ct. at 1663 (quoting Brown v. Board of Educ., 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed. 1083 (1955)). Contrary to the City's argument, however, a proper respect for the principles of federalism does not require a court to adopt wholesale the local government's choice of remedies.
 
 
 14
 When a constitutional violation has been established, the defendant does not shoulder its burden at the remedy stage merely by coming forward with a plan. The defendant must "come forward with a plan that promises realistically to work, and promises realistically to work now." Green v. County Sch. Bd. of New Kent County, Va., 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) (emphasis in original). The district court has not only the power but the duty to ensure that the defendant's proposal represents the most effective means of achieving desegregation. See id.; see also Paradise, 480 U.S. at 183, 107 S.Ct. at 1072. Thus, when the City proposed its alternative plan to desegregate Yonkers, the district court was under a duty to "weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness." Green, 391 U.S. at 439, 88 S.Ct. at 1695. Accordingly, the district court did not abuse its discretion by rejecting those aspects of the City's plan it found ineffectual.
 
 
 15
 Nor can the City seriously maintain that it was excluded from the process of formulating the Supplemental LTPO. The district court invited the City's alternative proposal, gave the City eight months to demonstrate its feasibility, and held a ten-day hearing on its merits. In fashioning the remedy, the court retained those aspects of the City's plan it found realistic and effective, and jettisoned those it found unrealistic and unfeasible. This was a proper exercise of its authority. Cf. Dean v. Coughlin, 804 F.2d 207 (2d Cir.1986) (remedial order vacated where the district court adopted the plaintiffs' detailed and intrusive remedial plan without adequately considering the defendants' proposal).
 
 III
 
 16
 The City also argues that the district court overstepped its constitutional authority by appointing the Housing Special Master to implement the Supplemental LTPO. Again, we disagree.
 
 
 17
 The power of the federal courts to appoint special masters to monitor compliance with their remedial orders is well established. See, e.g., New York State Ass'n for Retarded Children v. Carey, 706 F.2d 956, 962-65 (2d Cir.), cert. denied, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983); Stone v. City & County of San Francisco, 968 F.2d 850, 859 n. 18 (9th Cir.1992) (collecting cases), cert. denied, --- U.S. ----, 113 S.Ct. 1050, 122 L.Ed.2d 358 (1993). Obviously, a special master vested with authority to implement a court's order poses a greater threat of intrusion than one whose authority is limited to monitoring compliance with that order. See, e.g., United States v. City of Parma, 661 F.2d 562 (6th Cir.1981), cert. denied, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). Nevertheless, as with any other remedial tool, the grant of administrative authority to a master does not amount to an abuse of the court's broad discretion if the authority conferred is tailored to cure the constitutional violation. See, e.g., Glover v. Johnson, 934 F.2d 703, 713 (6th Cir.1991) (upholding appointment of administrator).
 
 
 18
 We are not persuaded that the master's administrative authority is unjustified, or that a less intrusive method would suffice. The remedial phase of this litigation has now dragged on for eight years, producing few tangible results. The district judge, who has lived with this case since its inception, expressed understandable frustration with the cost and delay occasioned by the City's efforts to implement the court's prior remedial orders, most recently demonstrated by the City's failure to work effectively with the FHIO. The district court has fairly concluded that a "system which relies on consensus and mediation" has proven unreliable and ineffectual to integrate Yonkers. We see no basis to disturb his conclusion that effective desegregation requires a more centralized control in a single individual immune to the political pressures which have compromised the City's most recent efforts at compliance.
 
 
 19
 Finally, contrary to the City's characterization, the City is not removed from the day-to-day implementation of the order. The Supplemental LTPO requires the Housing Special Master to work together with the City. When disagreements arise, the Housing Special Master's decision will control, but the City has the right to appeal adverse decisions to the district court. This is not a dramatic change from the prior system, under which the City was required to work with the FHIO, a court-appointed agency, with the district court retaining the final word.
 
 
 20
 AFFIRMED.
 
 
 
 *
 Honorable Jack B. Weinstein, of the United States District Court for the Eastern District of New York, sitting by designation