**John D'AGNILLO, Plaintiff,**

**v.**

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVEL- OPMENT, et al., Defendants.**

**No. 89 Civ. 5609(CSH).**

United States District Court, S.D. New York.

May 30, 1997.

John D'Agnillo, Plaintiff pro se.

Fitzpatrick, Cooper & Clark, Birmingham, AL (Raymond P. Fitzpatrick, Jr., of counsel), for City of Yonkers and the other related Municipal Defendants.

Michael Sitcoe, Raymond M. Larizza, Department of Justice, Civil Division, Washington, D.C. (Jamir Couch, Carole W. Wilson, Angelo Aiosa, Herold J. Rennett, Department of Housing and Urban Development, of counsel), for Federal Defendants.

## MEMORANDUM AND ORDER

HAIGHT, Senior District Judge:

Continuing to profess concern for the environment of the City of Yonkers, plaintiff *pro se* John D'Agnillo moves again for injunctive and declaratory relief with respect to the implementation of housing orders issued in the Yonkers housing discrimination action presided over by Judge Sand under Docket No. 80 Civ. 6761(LBS).

Familiarity with all prior opinions in this case and in the housing case is presumed. In order to focus upon the present motion, it is pertinent to note that the motion represents plaintiff's fifth attempt to enjoin the construction of Yonkers housing required by Judge Sand's orders, and his third application for declaratory relief.

This Court denied plaintiff's four prior motions for an injunction. The Court of Appeals affirmed two of those denials; one was not appealed; and an appeal from the fourth denial is pending. *See* 738 F.Supp. 1443 (S.D.N.Y.1990) and 738 F.Supp. 1454 (S.D.N.Y.1990), *aff'd per curiam*, 923 F.2d 17 (2d Cir.), *cert. denied*, 501 U.S. 1254, 111 S.Ct. 2898, 115 L.Ed.2d 1062 (1991); Memorandum and Order dated April 14, 1993, 1993 WL 119710 (S.D.N.Y.); Memorandum and Order dated March 15, 1995, 1995 WL 110597 (S.D.N.Y.), *affirmed*, 100 F.3d 943 (2d Cir.1996); Memorandum and Order dated May 10, 1996 (S.D.N.Y.), *appeal pending*, 2d Cir. Dkt. No. 96–6194.

Plaintiff's prior motions for declaratory relief have been granted in part and denied in part. To the extent that the Court of Appeals has considered this Court's decisions concerning declaratory relief, those decisions have been affirmed.

*Background*

Plaintiff's present motion is filed against the background of events that have occurred subsequent to this Court's 1995 decision, reported at 1995 WL 110597. In order to place those events in perspective, it is useful to review the series of orders that Judge Sand has made in the housing litigation.

In June 1988, Judge Sand entered his first order mandating the creation of public and subsidized housing within the City of New Yonkers. This was the Long Term Plan Order ("LTPO"). The LTPO mandated the provision of 4,200 units of public and subsidized housing in Yonkers through both the construction of new units and the purchase of existing dwellings. Specifically, the housing contemplated by the LTPO consisted of 200 units of public housing east of the Saw Mill River Parkway, subsidized with funds made available by the Federal Department of Housing and Urban Development under the United States Housing Act of 1937; and approximately 4,000 units of long-term low-income units, of which 3,200 would be market rate units and 800 would be assisted units.

As the Court of Appeals had occasion to note in *United States v. Yonkers Board of Education*, 29 F.3d 40, 42 (2d Cir.1994), "[t]he LTPO proved inadequate to the task, however, and all parties agreed that modifications would be necessary to ensure the successful integration of Yonkers." After further proceedings before Judge Sand, he issued the Supplemental Long Term Plan Order adopting additional remedial measures ("SLTPO"). The SLTPO, entered on October 5, 1993, called for the construction of 800 units of subsidized housing in multi-year phases and the acquisition of 250 units of existing housing.

On January 6, 1997, Judge Sand entered the most recent housing implementation order, which remains in effect today. This is the Second Supplemental Long Term Plan Order ("SSLTPO"). The SSLTPO recites in ¶ 1 the parties' agreement "that new construction shall expeditiously proceed on Cross Street (22 units), Hoover Road (25 units) and Yonkers Avenue (64 units of rental housing)."

¶ 2 of the SSLTPO provides:

Annual Objectives: In addition to the new construction set forth in paragraph 1, for each of the six calendar years commencing January 1, 1997, the City of Yonkers agrees that it shall provide at least 100 units of affordable housing to LTPO qualified individuals. In providing said units, the City shall rely upon existing housing and/or new construction. The provision of an existing affordable housing opportunity, as defined in paragraph 6 below, shall count as a unit of affordable housing. Should the City fail to meet this objective in a timely fashion, as set forth above, it shall be responsible for meeting any shortfall during the following year, as well as achieving that year's objective. In no event shall the City of Yonkers be deemed to have complied with this order before providing the 600 affordable housing units as defined in this paragraph ad the units called for in paragraph 1 hereof. Upon attainment of the objectives of paragraphs 1 and 2 of this Order, the City shall be deemed to have achieved all of the requirements of the 1988 Consent Decree, LTPO, SLTPO and part VI of the HRO.

It will now be useful to review plaintiff's several prior motions for injunctive and declaratory relief, viewed in the context of these housing implementation orders.

Plaintiff's first motion for injunctive and declaratory relief targeted the housing contemplated by the LTPO. Plaintiff prayed for a judicial declaration that the federal and municipal defendants were violating environmental laws and rules, and for an injunction against "any further activities with respect to the construction and/or development, of any housing in the City of Yonkers" until the defendants had complied with those laws and rules. 738 F.Supp. at 1445. At the time of that motion, construction of the 200 units of public housing mandated by the LTPO was about to begin, but no sites had been selected for the 4,000 subsidized units.

This Court held that in environmental cases as elsewhere, the basis for injunctive relief is irreparable injury and the inadequa-

cy of legal remedies. 738 F.Supp. at 1456. I further concluded, relying upon Second Circuit authority, that it remains within the discretion of the district court to decline an injunction, even where deviations from procedures proscribed by the National Environmental Policy Act of 1969 ("NEPA") have occurred. *Id.* In these circumstances, I posed the decisive question on injunctive relief as "whether plaintiff and the City have shown imminent irreparable injury as contemplated by NEPA: namely, significant adverse impact upon the quality of the human environment." *Id.* Concluding that plaintiff had failed to make that showing, I denied a preliminary injunction. 738 F.Supp. at 1457. The Court of Appeals affirmed. 923 F.2d 17.

As to plaintiff's request for declaratory relief in the context of the LTPO, I considered whether the statute, regulations, and caselaw required, as plaintiff contended, the issuance of a comprehensive Environmental Impact Statement ("EIS") at that time. I concluded that, to a limited extent, an EIS was required.

At 738 F.Supp. 1465, I said:

Since the mandated construction of 4,200 units may fairly be analogized to a single proposal for federal action of the sort triggering NEPA, at least with respect to some identifiable conditions, there is Second Circuit authority for conducting a comprehensive EIS sooner rather than later, at least to the extent that environmental impacts are reasonably foreseeable.

Two "identifiable conditions" were discernible at the time of the LTPO: the effect of 4,200 additional housing units upon waste disposal and vehicular traffic. As to the first of these conditions, I said at 738 F.Supp. 1466:

I conclude that plaintiff is entitled to a declaratory judgment that NEPA and the pertinent regulations require preparation of an EIS at this time with respect to the impact of 4,200 additional housing units in the City of Yonkers upon the City's waste disposal system.

As to the second, I said at 1467:

I conclude that plaintiff is entitled to a declaratory judgment that NEPA and the

pertinent regulations require the FHIP and HUD to attempt an EIS with respect to the cumulative impact of 4,200 additional housing units upon vehicular traffic in the main thoroughfares of Yonkers (as opposed to the streets and intersections in the immediate vicinity of sites yet to be selected). Such an EIS may ultimately prove to be impractical. But I conclude that the agencies are required to try, and to try at this time.

To that extent, I granted plaintiff's motion for declaratory relief, and denied the balance of his request. The Court of Appeals affirmed. 923 F.2d at 18.

Obedient to this Court's order, the Fair Housing Implementation Office ("FHIO"), an entity created by one of Judge Sand's orders, performed a final Environmental Assessment ("EA") evaluating the cumulative effects of the total number of housing units contemplated by the LTPO on the sewage system and vehicular traffic in Yonkers. That EA resulted in a finding of no significant environmental impact ("FONSI"), which under the statutory and regulatory scheme relieved the agency of the need to prepare an EIS. *See* 1995 WL 110597 at *2 and n. 3.

Following the Court of Appeals' affirmance of this Court's denial of an injunction, the 200 units of public housing called for by the LTPO were constructed.

The Court of Appeals affirmed this Court's initial denial of injunctive and declaratory relief in an opinion dated January 8, 1991. The mandate issued forthwith. 923 F.2d at 18. In March 1993, plaintiff made another motion for preliminary injunctive relief. I denied that motion in a Memorandum and Order dated April 14, 1993 (without prejudice to reassertion in the light of subsequent circumstances). At the time of that motion and its resolution, it had become apparent that the LTPO was going to be substantially revised by Judge Sand, but no one knew what form the new housing plan would take. In those circumstances, I denied plaintiff's renewed motion for a preliminary injunction because there was no present showing of irreparable harm. No appeal was taken from that denial of an injunction. The revised housing plan emerged on October 5,

1993, when as noted, Judge Sand issued the SLTPO.

The SLTPO called for the construction of 800 units of subsidized housing in multi-year phases and the acquisition of 250 units of existing housing. With respect to new construction, the SLTPO specifically identified three first year sites (Cross Street, Hoover Road and Yonkers Avenue), and established procedures for selection of the specific proposal for development for each of these sites. The SLTPO also established procedures for the submission of proposals for development of second and third year sites and a plan for development of small new construction sites. Following issuance of the SLTPO, plaintiff moved for a judicial declaration that defendants were required to prepare a comprehensive EIS assessing the environmental impacts of the multi-year plan. Plaintiff also sought to enjoin any further construction.

This Court denied that injunction, for the reason that plaintiff had "failed to demonstrate any present likelihood of imminent irreparable harm to the environment from continued implementation of the SLTPO." 1995 WL 110597 at *5. I also denied plaintiff's motion for declaratory relief. The Court of Appeals affirmed the denial of an injunction, 100 F.3d 943 (2d Cir.1996), in a summary order which did not consider this Court's denial of declaratory relief on the ground that, to that extent, the order was unappealable. *See* 1996 WL 47993 (2d Cir.).

This brings us to the SSLTPO, issued on November 6, 1996, whose provisions with respect to mandated housing have been quoted *supra.* In the circumstances arising from that order of Judge Sand, plaintiff renews his motions for injunctive and declaratory relief, based on professed environmental concerns.

Specifically, plaintiff prays for a declaratory judgment that all EAs and FONSIs "now on the record are null and void"; that a comprehensive EIS must now be conducted "on the multi-year cumulative environmental impacts" of the SSLTPO; and that new EAs must be conducted on the individual sites scheduled for construction under the SSLTPO. Plaintiff prays for an injunction against "acquisition of sites, or expenditure of Federal or other funds for construction activities," prior to the completion of the EIS and the EAs contemplated in plaintiff's motion for declaratory relief.

*Discussion*

*Declaratory Relief*

Plaintiff's first request for declaratory relief asks that the Court declare null and void all prior EAs and FONSIs previously performed in connection with the housing mandated or contemplated by Judge Sand's orders.

This request is triggered by a particular provision in the SSLTPO. Specifically, by the terms of that order at ¶¶ 8 and 9, the FHIO was dissolved effective January 15, 1997, and the administration of the Affordable Housing Trust Fund was transferred to the City of Yonkers. The order directed the City to create, by January 1, 1997, a separate City Department entitled "Affordable Housing Implementation Office" ("AHIO"), which would be responsible for the implementation of the housing mandated by the SSLTPO. As a consequence of those provisions in the SSLTPO, this Court, in a memorandum and order dated May 8, 1997, substituted AHIO and its director, Joe L. Farmer, as parties defendant for FHIO and its former director, Karen Hill, pursuant to Rule 25(c), Fed. R.Civ.P.

At the time when FHIO was still responsible for implementing Judge Sand's housing orders, that agency had prepared a number of the environmental documents required by NEPA regulations. I have noted previously that following this Court's 1990 opinion, FHIO performed a final EA with respect to the effect upon Yonkers' sewage system and vehicular traffic of the housing contemplated by the LTPO, which resulted in a FONSI. In addition, following promulgation of the SLTPO, FHIO re-evaluated its environmental assessment of the cumulative effect of the long-term housing in light of that order, and, in addition, completed site-specific environmental assessments for the first of three first year sites. FHIO found no significant environmental impact resulting from the overall SLTPO housing or from the three specific development proposals.

Plaintiff contends that as the result of AHIO and the City of Yonkers having succeeded, under the terms of the SSLTPO, to the responsibilities previously held by FHIO, all environmental assessments conducted by FHIO must be discarded and disregarded.

The Federal and City defendants argue that AHIO can adopt the environmental documents prepared by FHIO. Plaintiff responds that such adoption is precluded by the NEPA regulations. No party cites any caselaw. The question turns upon the proper construction of the pertinent regulations, which appear in Part 1500 of 40 C.F.R.

After setting forth the purpose of NEPA, 40 C.F.R. § 1500.1, its policy, § 1500.2, and its mandate, § 1500.3, 40 C.F.R. § 1500.4 addresses the subject of "Reducing Paperwork." That section provides in part:

Agencies shall reduce excessive paperwork by:

. . . . .

(n) Eliminating duplication with State and Local procedures, by providing for joint preparation (§ 1506.2), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.03).

40 C.F.R. § 1500.5, captioned "Reducing Delay," provides in part:

Agencies shall reduce delay by: ...

(h) Eliminating duplication with State and Local procedures, by providing for joint preparation (§ 1506.2), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.03).

These regulations, aimed respectively at reducing paperwork and reducing delay, use the phrase "appropriate environmental documents." An "environmental document" is defined in 40 C.F.R. § 1508.10, which provides:

*Environmental Document* includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

§§ 1500.4(n) and 1500.5(h), which provide "that an agency may adopt appropriate environmental documents prepared by another agency," both contain parenthetical references to § 1506.3. § 1506.3, captioned "Adoption," is limited to an environmental impact statement. § 1506.3(a) provides:

An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

Other subsections of § 1506.3 go on to specify procedures to be followed in adopting an environmental impact statement in a variety of circumstances.

The case at bar poses the question whether an agency may adopt all "environmental documents" prepared by another agency, or whether the option of adoption exists only with respect to environmental impact statements. The regulations are not a model of clarity on the point, and there are some surface tensions between them. But I think that the first of these two constructions is correct.

Plaintiff stresses that the only parenthetical references in §§ 1500.4(n) and 1500.5(h) are to § 1506.3, which in turn is limited to the adoption of environmental impact statements. However, §§ 1500.4(n) and 1500.5(h) also use the phrase "appropriate environmental documents," thereby speaking in the plural; and the phrase "environmental document" is defined by § 1508.10 to include environmental assessments, environmental impact statements, and findings of no significant impact. Had the drafters of the regulations intended the limitation upon adoption for which plaintiff contends, it would have been easy enough for them to use the phrase "environmental impact statement" in §§ 1500.4(n) and 1500.5(h), instead of the phrase "appropriate environmental documents." Of course, plaintiff says that such a limitation arises by implication from the parenthetical references in these subsections to § 1506.3; but that construction, while permissible on the face of the regulations, does

violence to or at least undermines the phrase "appropriate environmental *documents*," which as noted is defined to include EAs and FONSIs as well as an EIS.

Moreover, plaintiff's construction would undermine the policy considerations that underlie § 1500.4, the reduction of excessive paperwork, and § 1500.5, the reduction of delay. Those salutary objectives would be significantly thwarted if the regulations are read to permit an agency to adopt only one of the several kinds of environmental documents provided for by the regulations. I am able to discern no principled reason why an agency may not adopt another agency's EA or FONSI, as well as an EIS.

For these reasons, I conclude that the NEPA regulations do not preclude AHIO from adopting FHIO's previously issued EAs and FONSIs. It follows that these environmental documents are not rendered null and void, and AHIO may make such use of them as is appropriate.

■ I must deal separately with an additional argument that plaintiff makes in support of his contention that the FHIOs, EAs and FONSIs should be disregarded. Plaintiff points out correctly that during the course of this litigation, the City of Yonkers has changed its litigation position. Plaintiff says in his main affidavit at 5: "an EA by the former grant recipient (FHIO) cannot be re-evaluated into an EIS by the succeeding grant recipient (City) who objected to the original EA and FONSI in the first place."

It is undoubtedly the fact that, during earlier stages of this litigation, the City of Yonkers and the other municipal defendants challenged the adequacy of the EAs and FONSIs conducted by the FHIO. Indeed, the City's original position with respect to environmental concerns prompted me to say in 1990 that "it is appropriate to recognize the City of Yonkers' transformation from a nominal defendant into a full-fledged plaintiff." 738 F.Supp. at 1455. And it is also accurate to say that the City, bearing the responsibility for implementation of the SSLTPO through the agency of the AHIO, contends on the present motion that plaintiff is not entitled to declaratory or injunctive relief.

Plaintiff's argument is that the City, having originally challenged the adequacy of FHIO's environmental documents, is now locked into that position, and therefore should not be permitted to adopt them.

Mr. Fitzpatrick, counsel for the City and the related municipal defendants, makes two points with respect to this seeming *volte face*. First, he makes the perfectly sound observation that the City defendants' "previous objections to environmental assessments performed by the FHIO over the course of the housing and environmental litigation" have for the most part been rejected by this Court, or rejected by HUD when that agency approved the release of funds for the three first-year sites. Fitzpatrick affidavit at ¶ 6. Second, the City defendants stress their commitment to full compliance with NEPA and its regulations in connection with the City's discharge of responsibilities placed upon it by the SSLTPO. *Id.* at ¶ 7. Mr. Fitzpatrick concludes his affidavit by asserting:

> The relief requested in plaintiff pro se's latest Motion for a Declaratory Judgment and Order is not necessary at this time. Under the terms of the SSLTPO, the City has assumed responsibility for the creation of affordable housing pursuant to the Court's housing orders. The City intends to fully comply with NEPA and will perform environmental reviews to the extent required by the statutes and their implementing regulations and by the orders of this Court.

*Id.* at ¶ 8.

During this litigation it has become plain enough that plaintiff would prefer to not to have any more public or subsidized housing constructed in the City of Yonkers. Up until the negotiation and entry of the SSLTPO in the housing case, plaintiff and the City defendants were comrades in arms. Plaintiff is not happy about the change in the City's litigation posture. If you are leading a charge, it must be discomfiting to discover that the supporting troops have not only returned to their trenches, but have suddenly materialized in the enemy's trenches and are shooting at you. Plaintiff says that the Court must do something about this: "This

Court's intervention is necessary to prevent an obvious descent into schizophrenia." Main affidavit at 9.

■ But there is no basis in law for the Court to say to the City defendants (including a different mayor), explicitly or by necessary implication, that those defendants are not permitted to assert their present position. Plaintiff cites no authority for that rather startling proposition. The courts recognize the doctrine of judicial estoppel, but only in special circumstances. *See Bates v. Long Island Railroad Co.*, 997 F.2d 1028, 1038 (2d Cir.1993) ("First, the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding; and second, the prior inconsistent position must have been adopted by the Court in some manner.") (footnote omitted), *cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993). In the case at bar, the City's arguably inconsistent positions were asserted in this proceeding, not a prior one; and in any event, the Court rejected rather than adopted the City defendants' environmental contentions.

■ Plaintiff's remaining claim for a declaratory relief is based on the contention that the issuance of the SSLTPO and related events gives rise to the necessity of a comprehensive EA or EIS at this time.

This Court's opinion, dated March 15, 1995, considered at some length the requisite timing and scope of environmental documents to be submitted in connection with implementation of the Yonkers Housing Plan. *See* 1995 WL 110597 at *5–*9. While that opinion was issued in the context of the SLTPO, its rationale and conclusions apply equally to consideration of the SSLTPO.

■ As noted in that prior opinion, NEPA requires an agency to have prepared a final impact statement at "the time at which it makes a recommendation or report on a proposal for federal action" (citing *Aberdeen and Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 320, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191 (1975) (emphasis in original)). *Id.* at *5. I concluded in the prior opinion that a "proposal" does not exist for any NEPA purposes "until development proposals have been recom-

mended for each site," rather than that earlier time when the sites are selected. That is to say, "when the FHIO has selected a developer and development proposal for a particular site, FHIO has moved beyond mere contemplation of the action and formulated a proposal triggering NEPA's requirement of the EA." *Id.* at *7.

As to the scope of the environmental documents required by the Yonkers Housing Plan, I concluded that "so long as any previously developed housing is factored into EAs prepared during later stages of development, FHIO will ensure comprehensive evaluation of the entire project." These references in the prior opinion to FHIO should now be read to apply to the City of Yonkers and its AHIO, since these entities have under the SSLTPO become the recipient of any future CDBG assistance and accordingly bear the responsibility for compliance with NEPA and its regulations. *See* discussion on the responsibility for preforming environmental review in 1995 WL 110597 at *10.

■ Plaintiff has taken the position throughout every stage of this litigation that NEPA requires a full-scale EIS. But NEPA does not always require an EIS. The statute requires that federal agencies proposing "major federal actions significantly affecting the quality of the human environment" include in their proposals or recommendations an EIS which provides an assessment of the beneficial and adverse environmental impacts of the proposed action. 42 U.S.C. § 4332(2)(C). The function of an EA is to determine whether or not a project "significantly" affects the environment. If it does, an EIS is mandatory. But if the EA results in a FONSI, the statute does not require an EIS. "If an agency prepares an EA and determines that a project will have no significant impact on the human environment, a costly and time consuming EIS need not be prepared." *Friends of the Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1556 (2d Cir. 1992). In *Ompompanoosuc* the Second Circuit continued:

Judicial review of agency decisions regarding whether an EIS is needed is essentially procedural. Once an agency has made a decision subject to NEPA's procedural re-

quirements, the only role for a court is to ensure that the agency has considered the environmental consequences. Accordingly, a reviewing court must ensure that [FERC] has taken a hard look at the environmental consequences and assess whether the agency has convincingly documented its determination of no significant impact.

*Id.* (citations and internal quotation marks omitted).

In the Second Circuit, the applicable scope of review of an agency's threshold determination that an impact statement is not required under § 102 of NEPA is the "'arbitrary, capricious, abuse of discretion' standard." *Hanly v. Kleindienst,* 471 F.2d 823, 830 (2d Cir.1972) *cert. denied,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

Applying these principles to the circumstances currently presented by the SSLTPO, plaintiff fails to demonstrate an entitlement to declaratory relief. With one possible exception, plaintiff makes no present showing of such an entitlement.

The FHIO has previously re-evaluated its environmental assessment of the cumulative effect of the long-term housing contemplated by SLTPO, and also prepared site-specific EAs for the three first year sites: Cross Street, Hoover Road, and Yonkers Avenue. HUD accepted those environmental assessments and approved the release of CDGB funds for those three sites. Plaintiff, joined at that time by the City, contended before the FHIO and then before HUD that these EAs did not comply with NEPA, its regulations, and this Court's orders, and that a comprehensive EIS was required at that stage. FHIO and HUD were not persuaded.

 Neither plaintiff nor the City sought a Court ruling that these earlier FHIO–generated EAs and FONSIs violated anything. To obtain such a ruling, plaintiff would have had to make the showing required by cases cited *supra,* delineating the boundaries of judicial review of agency compliance with NEPA. Plaintiff says in his reply affidavit at 7 that "[t]his Court has never explicitly ruled on this issue, raised by both the plaintiff and the City. That is, whether or not the FHIO has ever complied with this Court's MO & O" (that being a reference to the opinion dated March 15, 1995). But the vehicle for contending that a party has not complied with a Court order is a motion to hold that party in contempt. No such motion has been made in this case. The Court does not rule, explicitly or implicitly, on issues that are not raised in litigation.

To turn from the SLTPO to the SSLTPO, ¶ 1 calls for expeditious construction of the three first-year sites, covered by the EAs I have just discussed; and ¶ 2 calls for the provision of at least 100 units of affordable housing during each of the next six years. ¶¶ 3 and 4 of SSLTPO make it clear that further evaluations by the City and/or further rulings by Judge Sand must precede any construction on a particular site.[1] In

---

1. ¶¶ 3 and 4 of the SSLTPO provide:

 3. Sites for New Construction: The HSM has recommended and prioritized specific sites for new construction as set forth in her report dated March 1, 1996. In meeting the objectives set forth in paragraph 2 with new construction, the City agrees to use such sites so identified for new construction in the sequence heretofore established unless it proposes in a timely manner other sites or sequence for approval by the Court. The City shall be responsible for insuring the availability of the sites so identified for the new construction of affordable housing, including the optioning of such sites. To the extent site, planning and financing considerations permit, newly constructed units shall be in construction which includes market rate units, i.e., there is a preference for mixed income rather than all assisted housing.
 4. Use of School 15 site: Within thirty days of the date of this Order, the City shall designate specific sites and densities for sites in North-

east Yonkers sufficient to construct 34 units of housing, at least one half of which shall be affordable. The plaintiffs shall file comments on such designations within fifteen days and the Court shall thereafter determine any outstanding issue. Should the City not so proceed to designate alternative sites within this time period or should the Court not find said designations acceptable, the School 15 site shall remain in the inventory of housing sites to be used for that purpose. The time requirements cited in this paragraph are not intended to foreclose any good faith effort toward compliance with this provision which may require a reasonable extension of time as granted by the Court. Upon designation of alternative site(s) for the School 15 site and the approval of said alternative(s), the City shall forthwith commence planning and construction of said units and may thereafter proceed to use the School 15 site for education purposes. The affordable housing units so constructed shall count to-

these circumstances, it is not surprising to learn from the federal defendants' opposition to the present motion that "[t]here are no requests for release of funds for long term housing projects currently pending with HUD. No such requests have been submitted subsequent to the issuance of the SSLTPO." Federal Defendants' brief, dated March 20, 1997, at 9 n. 7. The City says in its opposing papers that "[a]s to the remaining sites recommended for new construction beyond the first year, consideration of these sites has not yet matured into specific proposals for action, triggering the requirements of NEPA and HCDA, as explained in this Court's March 13, 1995 Order." [2] Fitzpatrick affidavit, dated March 26, 1997, at ¶ 7. The City also says: "If any of these sites develops into development proposals for specific City action involving expenditure of federal funds, the City defendants intend to fully comply with the requirements of NEPA before committing federal funds." *Id.*[3] I am not prepared to assume that the City will not make a good faith effort at compliance.

The one specific issue raised by the present motion relates to development of a site at Hudson Terrace. Plaintiff attaches to his papers a copy of an article appearing in the January 19, 1997 issue of The Yonkers Herald Statesman. That article states that "the City Planning Board recently granted final approval for the Hudson Terrace housing development, a 48–unit, three-building project at 421 N. Broadway." The development will include 10 low-income units which "will be credited toward the city's court-ordered requirement that 100 units of affordable housing be created in each of the next six years." According to the article, "[c]onstruction is expected to start within the next two months, with completion scheduled by the end of this year."

As to the Hudson Terrace site, the City's present papers say only that "private developers have obtained approval under the Af-

fordable Housing Ordinance for development of the Hudson Terrace site, but no federal funds have been committed to that project." Fitzpatrick Affidavit at ¶ 7. If that means that federal funds will never be requested for the Hudson Terrace site, *quaere* whether NEPA is implicated at all. But if the City intends to fund the Hudson Terrace development in part with CDGB funds, the City should recall that in the Court's 1995 opinion, I said that "a proposal does not exist for NEPA purposes until a development proposal is selected for a particular site." 1995 WL 110597 at *7. This would appear to have occurred at Hoover Terrace.

In these circumstances, I direct the City to advise the Court in writing, with copies to plaintiff and the Federal defendants, on or before June 18, 1997, what its perceptions and intentions are with respect to an environmental assessment of the contemplated units at Hoover Terrace. The other parties may submit written responses, if so advised, within ten (10) days of their receipt of the City's letter.

With the exception of that direction, plaintiff's motion for declaratory relief on the present record is denied.

### Injunctive Relief

I have previously held that even if a defendant is in violation of NEPA and its regulations (which has not been shown), plaintiff is not entitled to an injunction unless he demonstrates that the defendant's continued activity will result in immediate irreparable harm in the form of significant impact upon the quality of the human environment. 1995 WL 110597 at *3.

On this motion, plaintiff does not even attempt to make that showing. His prayer for an injunction is based solely on the faulty premise that the prior environmental assessments are null and void. Plaintiff's motion for injunctive relief is denied.

---

ward the January 1997—December 1997 objective of 100 units.

**2.** The reference should be to the March *15*, 1995 order.

**3.** Compliance will require, *inter alia*, the City to factor any previously developed housing "into

EAs prepared during later stages of development," for the purpose of "ensur[ing] comprehensive evaluation of the entire project." Opinion dated March 15, 1995 at 1995 WL 110597 *9.

*Conclusion*

For the foregoing reasons, plaintiff's motion for declaratory and injunctive relief is denied on the present record.

The parties are directed to proceed in a manner consistent with this opinion.

It is SO ORDERED.